V. Board of Trustees of the University of LSU All right, Mr. Wilson. Good morning, Your Honors. Courtney Wilson and Charles C. Wolfe for the appellate Carolyn Johnson. She's ill this morning, but her husband is here. May it please the Court. This case has four parts, I think. What got us here is what I'll call the incident, the butt slap on August 10, 2018. That's really the second item in the case. The first, chronologically, is what I will call prior antecedent behavior by Dr. Schumacher, who was the one who butt slapped Ms. Johnson. The third part, again in chronological order, is her assignment to what I'll call the bug room while things progressed. The fourth part, which underlies all of these, is the affidavit from plaintiff, and that's what I'd like to start with. The first thing that I noticed about the affidavit is the Court seemed to strike all of the affidavit with respect to the prior conduct of Dr. Schumacher as conclusory. I don't think that this affidavit is conclusory. I think if you look at it, it is fact-intensive, and simple inspection would suggest to you that it's not conclusory. I think the Court also struck it or disregarded it as contradictory because of her deposition. In her deposition, she had the misfortune to confirm several things, one of which was that she had a good relationship with Dr. Schumacher prior to August 10. We attempted to clarify that in the statement of facts at item number four by stating she had a good working relationship with him. What's apparent in looking at that deposition testimony is that on the same page she began to describe conversations that she overheard at her desk between Dr. Schumacher and another worker who left in May of 2018. So immediately on the same page and thereafter, you have what I think is a self-contradictory deposition. And if the deposition is self-contradictory, as I understand it, the rule is that the Court is required to give the benefit of the doubt to the self-contradictory opponent and leave the resolution of that contradiction up to the jury. That was not done in this case. So the crucial fact, one crucial fact that could implicate the sham affidavit doctrine is that as I read in the deposition, she said she didn't tell Curtis about what you're calling the antecedent behavior. That's right. The harassment before the butt slap. It's worse than that. She also testified she didn't tell HR. Right. It is worse. So therefore, you'd agree to the extent that the affidavit then says, oh, I did tell LSU, then the district court would be correct to say that's directly contradictory. Yes, but it does better because she told Dr. Burke, who was the acting head of the division, and she told Dr. Burke several times about what was going on. She told Dr. Burke and Ms. Curtis, and we'll drop Ms. Curtis out of this, in March of 2018. Okay. And you know the case well, so you're going quickly. So knock Burke, knock Curtis out. The district court didn't err as to that, so we're shifting to . . . Let me finish my question. I have trouble hearing you. Okay. I'm talking pretty loud. I do talk loud. So I just want you to slow down. So you're saying, well, she never denied she told Dr. Burke, and my difficulty is where in the record do we know that Dr. Burke was your client's supervisor? She was acting head of the department. She wasn't my client's direct one-up supervisor. She was acting head of the department. Okay. But so how is notifying her, how does that . . . I mean, Curtis is her supervisor. Right. Burke could have been like Dr. Schumacher, as far as we know, just an authority figure but didn't have direct supervisory control. Sir, I can't cite chapter and verse on that, but my understanding of the way things work is you tell a head boss you've reported it to the employer, you've reported it to management, and management is on notice. Is there an organizational chart here? How do we know that phrase, head boss, is true? Because this is the animal division. You know, there's a lot of staff, and it's undisputed that Ms. Johnson is reporting to Ms. Curtis, I think. I think if you ask opposing counsel, she would concede that. Okay. I don't know that I could point to the record, but she's been repeatedly referred to as the acting head of the department without challenge. So I can't help you on that. But that is what you rely on in terms of notice of the antecedent harassment. It's Dr. Burke. I rely on that for reporting. I also rely on notice to LSU because of what Dr. Burke observed and what Jason with the HR observed on one occasion. Dr. Burke was present when many of these conversations between Dr. Schumacher and James occurred right at the plaintiff's desk. They would overhang the desk and have conversations about intimate acts with African-American women. Dr. Burke would come on those conversations and scold Dr. Schumacher, that's not nice, you shouldn't say that. This happened several times. On one occasion, well, that happened four or five times before May of 2018 when James left. Afterwards it happened twice. So you have about, well, I'm sorry, I got a little confused. You have about seven times when Ms. Johnson told Dr. Burke, complained to her, and it happened many times that she was there and saw this conversation. Another instance of personal knowledge is when a pornographic photograph of a football player was displayed. That's the one Jason saw? Yes, correct. And that's the only incident Jason saw? That's correct. So harder to impute knowledge to LSU from that incident. And all the times that Dr. Burke saw it. So you have both personal observation and direct reporting. So I think that the record establishes in a non-conclusory and non-contradictory way that LSU had noticed. I think that basically addresses the issue of prior. I think that they are, whether they are actionable in and of themselves is not important. They may be cumulated with anything that's actionable. And I would then turn to what I'm calling the butt slap, sometimes referred to as the incident. On the first go-around, a judge has anyhow that the butt slap alone, standing alone, was not actionable. And I picked up on the phrase standing alone and put it in context, both with respect to the prior conduct by Dr. Shoemaker and with respect to what happened on that date in connection relatedly to the butt slap and the next work date. On the day that she was slapped, I knew pleading was that it raised a whelp, which lasted about a week, that it happened in front of at least two coworkers. It was publicly embarrassing and humiliating. It drove her out of the workplace for the rest of the day. She had insomnia over the weekend. And when she came to work on Monday, Dr. Shoemaker, who apparently was drinking, laughed at her and made fun of her. So I think that it satisfies many of the requisites for an actionable act of harassment. It was physically not only threatening but damaging. It was publicly embarrassing, and it had a devastating effect on her. And she reports that that August 16th, is it basically the first Monday after the incident? Yes. Okay, and then Curtis immediately separates the two. Is that correct? You can't hear me? Curtis, her supervisor, then immediately separated Dr. Shoemaker from Johnson, correct? I don't know if it was immediate, but it was promptly put her in what they claimed was a shared office with Ms. Curtis, but actually it was a library in another building, and she had no access to any of her work equipment. She had no computer, no phone, et cetera. She just sat there. Why they didn't hook her up with Zoom then, I don't know. But then after about a week of that, she was transferred to what we call the bug room. There's another contradiction, which again I think is self-contradictory. She admitted that Dr. Shoemaker never directly said anything inappropriate to her, but very quickly in the deposition she is talking about Dr. Shoemaker's repeated propositions to her, which ultimately culminated in her just blessing him out in the most explicit terms she could think of. So again, it's a self-contradictory deposition, and her affidavit should not be discounted on that basis. Let me turn, just in case all of the priors drop out of the butt slap, I've already emphasized that I believe standing alone because of the way it's been pleaded on the second chance that it's actionable. I've covered the argument on prior knowledge. I would now like to turn briefly to the so-called prompt and effective remedial action. I do not think it was prompt. I originally pleaded that the investigation did not begin for eight days. Actually, I miscited my source. It says 11 days. I kid people when I make a mathematical mistake. I tell people I married my math and my wife taught calculus for 30 years, so I think I have an excuse when I make a mathematical mistake. I do not think it was effective, but looking at the promptness, as the authorities show, is a hallmark of an effective investigation, and that did not happen here. One case held a 10-day delay while the investigating officer returned from vacation, as we have here, was ineffective, not prompt. I've already mentioned that. Before you leave that, my understanding of the importance of that missing person is that was the person who had to authorize it. There certainly are ways you can contact somebody when they're not in the office. Is that your point, that either they should not have waited for the missing supervisor, or what was the workaround that you said is required in this situation when the person who had to initiate the investigation was gone? Let me say that I arrived early, and I calibrated my hearing aids to everybody but you, so you're the hardest person to understand. That's what these two tell me also. So why isn't the absence of the supervisor justification for the delay? Well, two things. The supervisor who was absent was the vice chancellor, Morsbach, who has since died. I don't know why the people charged with the investigation couldn't have gone ahead immediately or picked up the phone and called the vice chancellor. Sir, we have this problem. Will you authorize us to go ahead? And no one's ever argued that that was a justifiable delay. That hasn't appeared in the record. No one's explained why it had to wait until Vice Chancellor Morsbach returned. So I don't think it's an excuse. It hasn't been offered as an excuse. It's certainly been offered as the explanation, yes, for the delay. Well, but there are explanations, and then there are excuses. There are defenses, and I don't think it's been offered as a defense to this. That's never been argued. So after the delay, she gets assigned to a bug room. She was assigned there for about four weeks, and I will concede, Ella, she was correct. She spent two weeks there actually in the bug room. What's significant about this is it was not a private office. It was a few steps around the corner from the original office. She still would run into Dr. Schumacher. She ran into him frequently enough and was so frightened by him that she stopped using the bathroom, and she actually urinated on herself two or three times in this bug room. She's not only swatting the bugs, she's hearing things that she thinks rats are scurrying around. Now, it's been suggested that bugs were common, but there's been no showing that bugs were common in the other workplaces. In fact, LSU was so unprepared for the bugs in that room that they had to actually go out and buy seven or eight cans of bug spray. They weren't readily on hand to combat the usual run-of-the-mill bugs in the workplace. This was an unusual condition. Where was the student that Dr. Schumacher allegedly harassed put? She was long gone. I know, but when she was experiencing her difficulty, was she put in the library? I don't know where she was working. I don't know where she was moved to. I don't know much about that. I just know that there was a documented incident of that with Celina Rose. Did I appreciate your question? Yeah, that's okay. That's fine. Okay, all right. And while she was in this bug room, she was being constantly threatened with termination if she did not return to work for Dr. Schumacher. She didn't continue to work with him. And finally, when the investigation was completed, Jason was able to— I'm going to pause you on that one. When you say when she was in the storage room, or call it a bug room, she was constantly threatened with termination if she didn't return to her workstation in front of Dr. Schumacher. Is that what you say? If she did not continue to work with and for Dr. Schumacher, she was repeatedly threatened by Jason, yes. Now, I wouldn't say constantly, but repeatedly, yes. But the two were separated, or no Dr. Schumacher's going in, giving her assignments? My appreciation of it was that the proximity might be reduced, but the working relationship would not otherwise be changed, that she would have to continue to work with Dr. Schumacher. And that was repeatedly threats from Jason. I think that with respect to the bug room being retaliatory, I have direct evidence where Chantel Curtis' earlier living proof of what happens when people stand up for themselves. I do not think we have to use McDonnell Douglas, but if we have to show pretext, I would say that they could have shipped her to someplace else, just like they did to the library, and hooked her up with Zoom. Just quickly, as your statement, there's direct evidence, no McDonnell Douglas. Can you give the record site to support the statement in your complaint that she said, this is what happens to people like you? Yes, it's in the Supplemental Admitted Complaint, No. 40. No, but not in the complaint, the record, underlying record support for it. Well, that's in the record, and it's the basis for that statement. The complaint is the basis for the factual allegation? Yes, sir. I will be frank with you. I cited that statement in, I think, the reply brief at page 22, but I did not cite the place in the record it occurred, so I double-checked it, and it occurs at the Supplemental Admitted Complaint, paragraph number 42. In the complaint? Yes, sir. I wish I could do better on that, but that's where it is. All right. Thank you, Mr. Wilson, and you've saved time for a bow. Ms. Ross? Good morning. May it please the Court. Emily Ross on behalf of the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College. The district court in this case correctly granted summary judgment because Ms. Johnson, the appellant, has no evidence to show a genuine issue of material fact on her racial or sexual harassment claims or her retaliation claim. And I think there are three issues in this case. The first is whether Ms. Johnson's claims of hostile work environment rise to the level of severe or pervasive under Title VII. The second is whether LSU knew or should have known about those allegations and failed to take prompt remedial action. And the third is whether Ms. Johnson has shown that LSU retaliated against her in response to making those allegations. If the second, if you prevail on the second, we don't have to reach to whether it relied, either the butt slap alone or the whole set of conduct. That's correct. Yes, Your Honor. If LSU, with respect to the butt slap, as I'll call it, if LSU took prompt remedial action with respect to that once it was made aware, and if LSU did not have knowledge about the pre-August 2018 incident allegations, then this Court does not have to get to the severe or pervasive element at all. And, you know, I know counsel started his argument with the affidavit and the Court striking the affidavit. I'd rather not do that because I don't think that this Court even needs to get into the affidavit issue. As an initial matter, we argued to the District Court to strike the affidavit and the District Court denied that motion. So the Court didn't strike the affidavit. He allowed it in but held it was insufficient on summary judgment. But this Court, again, does not even need to get into that because under all of this Court's jurisprudence, the sexual and racial harassment claims were not sufficiently severe or pervasive to be actionable under Title VII. And if they are, LSU either did not know about it or took prompt remedial action with respect to those. So with regard to the sexual harassment claim, there are two parts to that, as Your Honors are aware. The claim that her coworker, Dr. Schumacher, tapped her behind on one occasion on August 10, 2018, and then her allegation that this contact was actually the culmination of ongoing harassment from Dr. Schumacher. Two judges of the District Court have now dismissed this one incident as being not actionable under Title VII. Judge Zaney originally dismissed it, and Judge Guidry has now dismissed it again. And under this Court's precedent in Gibson v. Potter, Paul v. Northrop Grumman, Duruan v. Carquess, those judges were correct to dismiss it. And I don't want to belabor that point because he has not really argued that. So I think that the law is very clear that one incident such as this is not sufficiently severe or pervasive under Title VII. Okay. The case you think is most analogous, I mean, whatever the word you did, touch not, it's not what's alleged. Alleged here is it's a sexual assault that caused a welt for a week. What's the case that says that type of to, you know, the rear end of somebody isn't sufficient alone? Well, all of, as an initial matter, the idea that this caused a welt that lasted a week is not something that she ever said in her deposition, and it's not something that is supported by anything in the record other than her statement in the affidavit. There's no medical reports. There's nothing to support that. But the affidavit, it stands for what it stands for. It's not bare bones. She's describing in great detail. Right. Yeah, I understand. I think the important part here is that there's no cases to say that even when this one incident where he tapped, I mean, and it was alleged originally to be a slap or a tap on the behind, something that was not quite so egregious. But that this one incident is not sufficient, and there's no, he doesn't cite to any case law that says that even though it leaves a mark, that makes it per se severe under the cases. Let me ask you, there is the Lede case, which I'm not terribly familiar with. The opposing counsel cites Cherry, and in Cherry there is this reference to Lede, which is a case where a person was poked in the behind and then some comment was made, and that was found to be sufficient. Cherry itself is multiple events, but it relied or cited a case. Are you familiar with, if you look at my notes, I'm pretty sure it's the Lede case. Are you familiar with that? I'm not familiar with the Lede case. But it's a single incident case, which is terribly significant, it seems to me, to whether there's enough here. The Lede case, and I did look at it, and from my recollection, in that case the aggressor had actually poked, and I don't want to get too graphic here, but poked the other person in his anus. And so it was objectively more severe than what is alleged here, which is that Dr. Schumacher was trying to tell her she was doing a good job, quote, and tapped her on the behind. Caused a physical injury in this case and was a little bit more intimate than the other case. I don't know where that balance ends up, in your favor or not. I do understand that. And once again, you know, I don't want to get bogged down because I don't think that this court even needs to find the severe pervasive element. And so I think I'll skip over that because I think that under the fifth element of the hostile work environment claim, she has to show that LSU knew or should have known about the behavior and failed to take prompt remedial action. And as you notice, Judge Jigginson, it is undisputed that Chantel Curtis was her supervisor, and it is undisputed that she did not tell Chantel Curtis or HR about any of the pre-August 2018 behavior. Which is required for the pervasiveness, right? Because he talks about her breasts. She talks about sex with black females. He looks down her blouse. He asks her out, sounding very pervasive to me. But I know we're moving away from that. But I think he conceded that the district court probably was correct to say that she stuck with her deposition, that she didn't tell Curtis. But then he turned around and said he thought you'd stand up here and say, yes, Dr. Burke was a supervisor. No, Dr. Burke was not her supervisor. It's very clear from the record that her supervisor was Ms. Curtis. She says it in her deposition. How do we know Dr. Burke's position? Let's assume Dr. Burke was around, heard all the complaints. Only from her affidavit that she says that she was the acting director. In Chantel Curtis's deposition, she says there was no director of the Division of Animal Care at the time that this incident occurred. So only from the affidavit. What do we know to take out what she wasn't? Do we know what she was, Dr. Burke? She was a veterinarian in the Division of Animal Care, just like Dr. Schumacher was. So that was her role. And I do want to say the reporting to Burke is insufficient. And Judge Huygensen has already sort of gotten to this point. But I do want to emphasize that, A, she only reported, allegedly reported, the conversations that Dr. Schumacher was purportedly having with the co-worker. She did not allege any of these other allegations. She didn't report any of these other allegations regarding calling her boo or looking down her blouse or anything like that. So it's this one particular thing. And then in addition to that, when she reported the August 2018 incident to HR, she did not at that time or at any point during that investigation or reporting period, she did not at all tell HR, hey, he's also been doing these other things that have been bothering me. She never mentions it to HR. The only time LSU becomes aware of this is in her late-filed amended complaint when she tells the district court, after Judge Zaney has already dismissed the butt slap incident as not sufficiently severe or pervasive, then she tells the court and LSU, never mind, he's actually been doing these other things. So she knew to report it in August 2018. When that incident happened, she knew she needed to call her supervisor. She needed to tell HR. And that's what she did. And the fact that she didn't do that with respect to any of the pre-August allegations is telling. In addition, under this court's precedent in the Lauderdale case, Lauderdale v. Texas Department of Criminal Justice, when a plaintiff reports to one person, and if we assume that she reported to Burke, and there's no corroborating testimony of that, but if we assume she reported to Burke, reporting to one person when that's ineffective, it's unreasonable for her not to then report to someone else. And in this case, it was unreasonable not only because it was seemingly ineffective, but also because she knew the correct process to follow. With respect to the prompt remedial action prong, remedial action is action reasonably calculated to end the harassment. And in this case, it's undisputed that the day she reported it to HR, August 16th, her and Dr. Schumacher were separated. There's no dispute as to that she was moved to the library. She takes issue with where she was moved next, which I'll get to. But the investigation lasted less than a month. And on September 18th, LSU told her her complaint was substantiated. She could move back to her original workspace. And Dr. Schumacher was going to be moved out of animal care, moved somewhere else. They were not going to have to work together. They were not going to have to work in the same vicinity together. And, in fact, in- He made the assertion that during the weeks that the investigation is ongoing, she was still working with Dr. Schumacher. He made the assertion that she was told she would still have to work with him. But she was doing her work. There's no indication that she actually had any contact with Dr. Schumacher at all, whether via e-mail or telephone or in person. There's no allegation that they had any contact whatsoever. And, in fact, the harassment stopped while the investigation was going on and afterwards. And in her deposition, she testified that she was asked, you were told you would not have to work directly with Dr. Schumacher once you made this allegation. And she said, yes, I knew I wouldn't have to work with him after that. And, in fact- Let me stop you there. Is it clear we're not going to have to work during the investigation or we're not ever going to have to work with him again? During the investigation and then once it was substantiated, we would not have to work with him again after that either. And I do also want to point out that she went on medical leave from October to December 2018. In December of 2018, her doctor presented a note to LSU saying she could come back only if certain accommodations were met. And that was that she work 20-hour work weeks, that she be given time off for medical appointments, and that she be moved out of the Division of Animal Care. And LSU agreed to all of that. They granted her requests for 20-hour work weeks, moved her to the Division of Property and Facilities Management, and basically gave her everything that she asked for. There's no doubt that LSU's actions in this case were designed and calculated to end the harassment, and they actually did end the harassment. And under this court's jurisprudence in Skidmore v. Precision Printing, when a coworker is instructed to stay away from the plaintiff and when the harassment ends, the two put on different shifts, that was sufficient to be prompt remedial action. And in that case, the investigation didn't start for three months, and the court said that doesn't matter because they were separated. That was enough to be remedial action. I do want to touch on the retaliation claim because counsel didn't mention this, but it is in the briefs that the district court utilized an outdated standard for the retaliation claim. That's true. But on DeNova review, of course, this court can utilize the Burlington standard and can still find that there was no materially adverse employment action that would dissuade a reasonable worker from making a charge of discrimination. Well, if you take her facts as true, it's rodent and insect infested, and it's black, that might chill someone from making a complaint. Do you have to win on that? No. Okay, well, first of all, I don't think that under the case law that that would alone be sufficient to be retaliation, to be materially adverse retaliation. But in addition, LSU has nondiscriminatory reasons that it put forward for everything. First off, bugs are common in animal care. There's live animals. There's animal feed. It's not uncommon for there to be gnats around. It's not that uncommon. Second of all, she was given bug spray when she asked for it, and there was nothing further said about it. LSU assumed that it was taken care of. Dr. Burke and Chantel Curtis both testified that she was moved to that location and the windows were darkened over for her own protection because she wanted to be anonymous. She wanted privacy. And I won't call it a bug room, but the storage area that she was placed in was a former storage area, but it was in an office. I mean, it's an office building. It was still an office with a door, with windows, with counter space, with her computer, with her phone. It's not as if she was put in some sort of warehouse or barn or anything. This was still in the office. And so she has no evidence to show that any of those reasons are pretextual or that there was any sort of retaliation or they were done. What about counsel's claim that we don't even get to the McDonald's, we don't get to the burden shifting because Curtis made the statement? Well, as you pointed out, I think that statement was made in a complaint, and on summary judgment she has to come forward with some evidence. It's not sufficient on summary judgment for her to point to her pleadings. And the fact that that statement wasn't even in the affidavit, it's not sufficient on summary judgment to be direct evidence of retaliation. Curtis was deposed. Was Curtis deposed? Yes, Curtis was deposed. And was she asked about that statement? No, she was not asked about that statement. So there's nothing in the deposition concerning that in some peripheral way even? No, sir. All right. And with respect to Jason Johnson allegedly seeing some photo that she alleges that sufficient knowledge for LSU as an initial matter, the photo that she is alleging was offensive was a picture of her face on a football player. That was not alleged to be sexual harassment or racial harassment, so that's not even an allegation in this complaint or in this case. But in addition, it's unclear how Jason Johnson was not deposed, so his deposition testimony is not on the record, and it's unclear how him maybe seeing this would have prompted him to say, oh, this is harassment, this is offensive, without some sort of complaint from Ms. Johnson. So that's not sufficient to be knowledge either. And so I'll just, I've got four minutes left. Unless the Court has any other questions, I'm just going to wrap up that, you know, the Supreme Court has made it very clear that in Title VII cases it's important to separate significant from trivial harms and that Title VII is not intended to be a general civility code for the American workplace. That's why there are objective standards under hostile work environment and under retaliation claims, and in this case these facts don't even come close to meeting those objective standards. So we would respectfully request the Court affirm the District Court's decision to dismiss this case. Thank you. Thank you, Ms. Ross. Mr. Wilson for rebuttal. Turning first to the statement that two judges have dismissed the butt slap standing alone as sufficient. First of all, I would remind the Court that Judge Janey's ruling was standing alone. It was not sufficient. Well, we tried to remedy that. I think we have. Judge Guidry merely affirmed, sort of almost like rubber stamping Judge Janey, his term was now on this matter the posture below remains unchanged. That's kind of Delphic-like. I really don't know what that means, but suffice to say I do not think the judge gave it much attention. Nevertheless, opposing counsel skips the severe and pervasive and goes right to the second argument, which is combined, and the Court pointed out that if she wins on that, she wins, knowledge and prompt remedial action, I would respectfully suggest that LSU loses and loses decisively on that. I think that direct observation by the acting director and reporting to the acting director has got to be sufficient notice. If it's not, I guess I go home. It never occurred to me that that would not be sufficient. The fact that she was an acting supervisor has never been denied, and that has not been denied today in oral argument. Let me make sure I understand that. We're talking about Burke, right? Burke, yes, sir. I think it was denied in oral argument. Is there any evidence or assertion that we could rely on that Burke had that role? The only thing I heard counsel say was to repeat the testimony of Chantel Curtis that there was no director at that time. That does not negate that there was no acting director, and it seems to me reasonably there would be, and that was Dr. Burke, and that's never been denied. All right, counsel. There is a statement that because she did not report something to Chantel Curtis that it's telling. That is an invitation to make a credibility call, which I think is not this court's duty. With respect to the statement that she was told she would not have to work with Dr. Shoemaker, I think that is contradicted, controverted by the record where she testifies that Jason Johnson of HR repeatedly told her that she would have to work again with him, and that if she didn't, she could lose her job. Remember that I am HR and you are telling me that you're not going to work with him. These are quotes from her in the record. Finally, when the investigation was concluded and she was reassigned back to her original workstation, because that's what happened first before she got transferred to another division, Jason himself apologized. He said, look, I'm sorry, you're going to have to work with him, and I apologize, but that is also in the record. So she was going to have contact with this guy. And while she was in the bug room, which was just around the corner from her original station, she was running into Dr. Shoemaker on occasions when she would have to leave, for example, to go to the bathroom. I've already told this court she was so afraid of the guy, she stayed in the bug room and she urinated on herself two or three times. So I just cannot believe that that is a sufficient remedy. It's neither timely nor is it designed to end the harassment. Yes, sir. When she cites Lauderdale for the proposition that if Dr. Burke were a supervisor and yet didn't take action, the responsibility would be to go to somebody else. Are you familiar with that case and that logic? I don't have an answer for that. Because all I can tell you is that if you take the affidavit, for what it says, she did complain to Ms. Curtis on several occasions, once in March of 2018, at the same time that Dr. Burke was there. I don't recall if thereafter she complained to Curtis, and I'm not sure what the record shows. But at least there was that one complaint to Ms. Curtis. Finally, the bug spray did not really cure the situation. Ms. Johnson, in her affidavit, recalls that she sprayed all over the place, but the bug spray was too much for her. She went home sick that day. So there was no remedy and no cure there. With respect to the windows, her testimony is that she had no notice. She did not agree to having the windows blackened. So I would suggest that there is knowledge and there is a lack of a prompt and effective remedy so that Elisha cannot prevail on that argument. Thank you, Your Honor. Thank you, Mr. Wilson. Your case and all of today's cases are under submission, and the Court is in recess until 9 o'clock tomorrow.